HARRIS, J,,
delivered the opinion of the Court.
The complainant brings this bill to set aside a deed of gift for two hundred acres of land, and fifteen slaves, which was executed by the complainant, E. S, Walton, to the defendant, on the 28th day of January, 1854, on the alleged ground that at the time of its execution, from mental imbecility, the complainant was incapable of making the same. That he reposed in the defendant, who was his grandson, the most unlimited confidence; he was then about seventy-four years of age, had within a few days lost his third wife, was in very feeble health, and laboring at the time under great mental distress, and that defendant took advantage of his infirmities, and by the exertion of undue influence over his weakness, obtained the deed in question. Defendant had induced him to believe that a lady in the neighborhood was about to institute an action of slander against him, which would probably take from him his entire estate, unless prevented by the proposed conveyance, which defendant *284 fraudulently procured Mm to mate, well knowing at the time that it could have no such effect; that this was a mere fraudulent contrivance to get the property conveyed to himself. The answer admits the execution of the deed — that it was within a few days after the death of complainant’s wife — that he was in mental distress, was aged and in feeble health, hut denies his incapacity; denies that undue, or any influence was exerted by defendant; denies all fraud, and asserts that it was only carrying into effect a long-cherished and often-expressed purpose of his grandfather, to give him his gstate; that he was the son of an only daughter, by complainant’s first wife, by whom he received a large portion of his property. That complainant had two other daughters, the issue of his second marriage; both of whom long since married, one to complainant’s next friend, McLean, and the other to one Morrisson, for whom he had already made provision. That he had repeatedly told respondent’s father that in disposing of his property, to give respondent nothing, as he intended, he should have his estate. Prior to the making of the deed, complainant had written, and duly executed his will, which was, with the exception of two slaves, identical with the provisions of the deed, as to the property given to defendant.
Defendant asserts, that so far from his having procured the execution of the deed, the complainant, immediately upon the death of his wife, importuned defendant with great earnestness to abandon the pursuit of the practice of law, in which he had recently engaged, and go out and live upon the farm; that he had long intended that at his death, defendant should have his property, hut now, as he was left alone, he desired *285 defendant to go out and take charge' of the land, and slaves, and he would make a conveyance of his property to him; that he would like to see him enjoy it in his life-time, and that he would live with defendant the balance of his life. Defendant was fascinated with his profession, and hesitated to abandon it. Complainant, however, still urged it, asked him to look around him, at the gentlemen who had grown gray in the labors of the profession, without being able to treasure up as much as he then desired to give defendant, if he would abandon the profession and go to the farm; that he could not expect to become as eminent and distinguished in his profession as George Boyd had done, and that even he had not made as much as complainant would then give him, if he would accede to his terms. Defendant then proposed that he would go out and stay with him of nights, and would occupy his office and attend to the business of his profession in the day. This did not meet the views of complainant, and he procured some of his friends, who he knew had great influence with defendant, to intercede, and prevail. upon him, to yield to his wishes. Defendant ultimately consented, abandoned his office and his profession, and went out. Soon after, complainant drew up, with his own hand, and without the aid or suggestion of defendant, a deed, similar, indeed, identical, in all its provisions, with the deed in question, except that the one drawn by complainant expressed a consideration of ten thousand dollars. This deed was carried by complainant himself, accompanied by defendant, to his old friends and legal advisers for years, Henry & Shackle-ford, and submitted to them, to know if it was correctly drawn, so as to pass the title to the property therein *286 mentioned. Defendant withdrew from their office, and as he is advised, they asked complainant if he fully understood the effect and consequences of what he was doing. He said he did. They having heard something of the threatened slander suit, and suspecting that that may have prompted the conveyance, told him, that it could not have the effect to protect the property from the satisfaction of any recovery that might be had, if such action should be brought. He told them that he intended it as a gift to defendant, and had only inserted the consideration of ten thousand dollars to keep his sons-in-law, McLean and Morrisson, from attempting to disturb it after his death: that he would give defendant a receipt against the ten thousand dollars. They suggested, that as he intended it as a gift, it would be best so to express it on the face of the deed. He then requested them to draw such deed, which they did. He executed it in their presence, it was witnessed by them, its probate and registration was procured by complainant himself, and it is the deed now in controversy. He says he has offered to convey the property to complainant, during his life, or to secure to him a support out of the use of it, either of which he is still willing to do. Upon the issues here presented fifty-eight witnesses have been examined at great length, producing considerable conflict, as to the state of complainant’s mind at the time, before and after the execution of the deed. The result of which, in our opinion, satisfactorily establishes that, although complainant was quite aged, infirm, and capricious; yet, when free from excitement produced by intemperance, or passion, he was capable of making a valid contract, in the absence of undue influence, or *287 fraudulent devices, by which, he might have been easily overreached. This brings us to inquire whether such influences, or fraudulent devices, were brought to bear upon him, by which the deed in question was procured, as would vitiate it.
From the proof, we think it is very clear that, for several years, it had been a settled purpose with complainant, so to secure this property to the defendant as to take effect after his death. For this purpose he had, prior to the making of the deed, executed his will. And we think it is equally clear that, after the death of complainant’s wife, he became anxious that defendant, who was his favorite, should abandon his profession, and go out, and live with him upon the plantation; and to induce him to do so, he proposed that instead of giving him his estate by will, as he had previously intended, he would convey it by deed, and put him at once in possession of it, and would live with him the balance of his life. The testimony establishes this fact beyond all question. The proof shows that defendant was reluctant to abandon his profession, and that complainant procured his friends to use their influence to prevail upon him to do so: he reasoned upon the subject, and put such arguments in their mouths, as are wholly incompatible with the idea that he was then laboring under any considerable mental imbecility; at least not such as wmuld render him wholly incapable of making a valid contract. He compared the pecuniary situation he could at once place his grandson in, with the circumstances of the most eminent and distinguished members of the profession in that portion of the State, who had, in his own language, grown gray in their professional labors, and whose emi *288 nence Ms grandson could not hope to equal; and yet he desired at once, without the labor and hazard of success to place him, as he thought, in a better situation than they had obtained. We doubt whether there are many gentlemen belonging to the profession who are prepared to discover many evidences .of mental imbecility in this logic.
The proof shows that after the defendant had yielded to his wishes, had given up his professional pursuits, and gone to the country to live with him, the complainant, with his own hand, wrote and executed the deed, and then proposed to submit it to his experienced legal advisers, Henry & Shackleford, to get their opinion as to its sufficiency to effect the purposes contemplated. All this takes place before we hear any thing of the threatened slander suit.
Now, if this deed had been procured through the undue influence or false and fraudulent representations of the defendant, practiced upon an imbecile old man, who was incapable of taking care of himself, is it not probable that the same influences would have prevented him from presenting his imbecility and the deed to the scrutinizing eye of Henry & Shackleford, where his whole scheme would be so liable to be upset and defeated? In addition to this, in the absence of the defendant, complainant was asked if he was fully apprised of the effect and consequences of his act — that he was surrendering up in prcesenti, all right to the property conveyed, not even retaining to himself a life-estate. He said he did understand it. That he had formerly intended to give it to defendant, by will, but now he preferred to give it by deed; so that they might not be litigating over his will, *289 after be was dead, as they were then doing over tbe will of Jordan. That be bad retained a valuable bouse and lot in Clarksville, and upwards of $2000, in good debts, wbicb be bad not conveyed, and that be intended to live with defendant wbo would support bim. They also assured bim that if bis object, in making tbe conveyance, was to avoid tbe consequences of tbe threatened slander suit, wbicb bad then been spoken of, it could have no such effect. After a very free conversation with complainant, in wbicb tbe effect and consequences of tbe conveyance were fully explained to bim, Major Henry, at bis request, re-drafted tbe deed, expressing upon its face, that it was made in consideration of natural love and affection, instead of ten thousand dollars, as expressed in tbe deed written by complainant.
Without further pursuing this vast volume of proof, in detail, it is sufficient to say that we have been unable to find any proof in this whole record, upon wbicb we can satisfactorily rest tbe conclusion that this conveyance was procured either by fraud or undue influence. Conveyances of this character should be rigidly scrutinized, and when there is evidence to ryarrant the conclusion that they have been obtained from persons of great weakness of mind, so as to be unable to guard themselves against imposition, or resist importunity, or undue influence, and that such influences have been brought to bear upon them in procuring such conveyances, they should be set aside. However, we have seen that there is nothing to warrant such a decree in this case; and if there were nothing more in. tbe record, we should feel constrained to affirm tbe decree of tbe Chancellor, dismissing tbe bill; but, as tbe defendant in bis *290 answer, sets up that he has always been willing, and yet is, to convey to complainant, for life, the property in controversy, or otherwise to secure him a support out of it, we think it is a proper case to order a reference to the Clerk and Master, to hear proof and determine what would be a reasonable rent for the land and hire for the slaves, and the defendant .will be charged with the ■same annually, from the time he received them until the death of complainant.